In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2534

WALKER WHATLEY,

*Petitioner-Appellant*,

*v.*

DUSHAN ZATECKY, Superintendent,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00465-JMS-DKL— **Jane E. Magnus-Stinson**, *Judge.*

ARGUED NOVEMBER 5, 2015 — DECIDED AUGUST 15, 2016

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Walker Whatley was convicted
under a now-repealed Indiana law of possessing a little more
than three grams of cocaine within 1000 feet of a "youth
program center." On direct appeal and in federal *habeas corpus*
proceedings, Whatley challenged the Indiana law on the
ground that the statutory definition of "youth program center"
was unconstitutionally vague. Although the Indiana Court of

Appeals vacated his conviction on other grounds, the Indiana Supreme Court reinstated it. The district court declined to address his *habeas* claim on the merits after determining that he had defaulted the claim. We conclude that Whatley did not procedurally default his claim, and that his petition should be granted.

**I.**

In March 2008, Whatley was arrested at his father's home on a warrant for an unrelated charge. The arresting officer discovered a bag containing just over three grams of cocaine in Whatley's pocket. Possession of this amount of cocaine is normally a Class C felony under Indiana law, with a sentencing range of two to eight years and an advisory sentence of four years. *See* Ind. Code §§ 35-48-4-6(b) and 35-50-2-6(a) (2008). But Whatley was charged with a Class A felony because a police officer determined that Whatley's father's home was approximately 795 feet from the Robinson Community Church.[1] Under a now-repealed Indiana law, possession of more than three grams of cocaine on a school bus or within 1000 feet of school property, a public park, a family housing complex or a "youth program center" was a Class A felony with a sentencing range of twenty to fifty years, and an advisory sentence of thirty years. *See* Ind. Code §§ 35-48-4-

---

[1] The State asserts in its response brief that the distance was "725.5 feet as the crow flies" and 795.3 feet as measured along the sidewalk. The statute does not specify how the distance should be measured but because the distance was within 1000 feet by either measure, the difference does not matter to the outcome of the case.

6(b)(3) and 35-50-2-4 (2008). The statute under which Whatley was charged defined "youth program center" as any:

> building or structure that on a regular basis provides recreational, vocational, academic, social, or other programs or services for persons less than eighteen (18) years of age.

Ind. Code. § 35-41-1-29(a). The definition includes the real property on which the building or structure is located, and excludes school property (which is covered expressly by another part of the statute), but the law specifies no further standards for determining whether a particular building or structure comes within the definition. Ind. Code § 35-41-1-29(a) and (b).

In support of its theory that the Robinson Community Church was a youth program center, the State presented the testimony of Robert T. Harvey, who at that time had been the senior pastor of the church for nine years. Harvey testified that the church hosted a number of events targeted to persons under the age of eighteen. In particular, the church hosted: (1) Amani[2] religious services for young people, several Sundays out of the month; (2) Boys to Men and Girls to Women mentoring programs, with no stated frequency; (3) a Girl Scout troop, twice a month on Wednesdays; (4) Family Fun Night every Friday; (5) Bible Circle every Wednesday; and

---

[2] Both parties refer to the children's services as "Amani" services but the record does not explain what this means or what the services involved. Whatley does not dispute that Amani services were targeted towards persons under the age of eighteen.

(6) two children's choirs, one meeting each Monday and the other each Wednesday. Harvey also testified that the church held two services each Sunday, attended by members of all ages, including children. Trial Tr. at 28-37. Harvey affirmed that all of the services provided to youth were essentially faith-based. Trial Tr. at 35. In any given week, therefore, the church hosted as few as four and as many as six programs specifically targeted for persons under the age of eighteen, all of them faith-based according to the church's senior pastor.[3] Moreover, none of the youth-oriented programs were held on Thursdays, the day of the week on which Whatley was arrested.[4]

In instructing the jury on the meaning of "youth program center," the court gave only the language of that subsection of the statute itself, namely that it included a "building or structure that on a regular basis provides recreational, voca-

----

[3] Despite Pastor Harvey's testimony that all of the services provided to youth were faith-based, the State nevertheless contends that the Girl Scout troop, Family Fun Night and the mentoring programs were not faith-based. Our decision does not depend on the religious character of the programs so we need not resolve the discrepancy.

[4] In fact, based on Harvey's testimony, there were no youth-oriented programs held at the church on Tuesdays, Thursdays or Saturdays. The statute provided a defense for persons who were only briefly in a prohibited area at a time that children were not present. Ind. Code 35-48-4-16 (2008). The trial court placed on Whatley the burden of proving this defense by a preponderance of the evidence. The Indiana Supreme Court later clarified that, once a defendant raises this defense and presents evidence in support, the burden passes to the State to disprove beyond a reasonable doubt at least one element of the defense. *Gallagher v. State*, 925 N.E.2d 350, 353 (Ind. 2010). Whatley did not appeal this issue in the Indiana courts.

tional, academic, social, or other programs or services for persons less than eighteen (18) years of age." Over the objection of Whatley's attorney, the court stripped from the jury instructions the statutory language regarding other locations that give rise to the same sentencing enhancement, including school buses, school property, a public park, or a family housing complex. The court concluded that, because there had been no evidence regarding those locations, they were irrelevant. The defense sought to include them in order to argue that, in context, churches were not meant to be included in the definition of "youth program centers." Although the court allowed Whatley's attorney to argue that Harvey's testimony was inadequate to meet the definition of youth program center and that churches were not meant to be included, counsel lacked a statutory context to support the argument.

Using those instructions, the jury convicted Whatley of possessing more than three grams of cocaine within 1000 feet of a youth program center, but acquitted him of a second count of dealing cocaine. The trial court sentenced him to thirty-five years' imprisonment. That sentence was more than four times longer than the maximum sentence available for a Class C felony conviction, and more than eight times longer than the advisory sentence for Class C felonies.

On direct appeal, Whatley argued that the statute defining "youth program center" was unconstitutionally vague, and that if the court nevertheless upheld his conviction, his sentence should be reduced. In particular, Whatley argued that the statute was unconstitutional because it forbade conduct in terms so vague that persons of ordinary intelligence must necessarily guess at the statute's meaning and differ as to its

application. He noted that the building at issue housed a church and that Harvey testified that the programs (with the exception of the Girl Scouts) held there were part of the church's ongoing religious life. Although children were occasionally present at the church for the activities described by Harvey, Whatley contended that these events did not give the church the character of a youth program center. Citing the purpose of the statute, namely to keep drugs away from places where children congregate, Whatley maintained that the statute provided no basis for individuals to know that they were near a youth program center. The other types of facilities listed in the statute, such as school buses, schools, parks and family housing complexes, he noted, are easily identifiable as such. But a person of ordinary intelligence would not be able to identify as a youth program center a building that bears no mark of the children's activities occasionally hosted there. Relying on *Manigault v. State*, 881 N.E.2d 679 (Ind. Ct. App. 2008), and *Polk v. State*, 683 N.E.2d 567 (Ind. 1997), Whatley urged the court to find that, in the absence of a bright line indicator or standard, no person of ordinary intelligence would be on notice that a church qualified as a youth program center, and the statute was therefore unconstitutionally vague.

The Indiana Court of Appeals reversed Whatley's conviction and remanded to the trial court for resentencing under the Class C felony statute. *Whatley v. State*, 906 N.E.2d 259 (Ind. Ct. App. 2009) (hereafter "*Whatley I*"). The appeals court first noted that the Indiana courts in general appeared to require a bright line rule to communicate to offenders what conduct is proscribed. The court nevertheless rejected Whatley's vagueness claim because the Indiana Supreme Court had concluded

that strict liability applied to the drug-free school zone law. According to the appeals court, no knowledge or notice was therefore required for constitutionality of the statute. *Whatley I*, 906 N.E.2d at 260-61 ("*Polk* tells us that such knowledge or notice is not required for constitutionality."). Instead, drug offenders pass through unmarked drug-free zones created by the statute at their own peril. *Polk*, 683 N.E.2d at 572. The appeals court thus held that if the church was a youth program center, Whatley's Class A conviction would stand. But the appeals court then turned to zoning law to determine whether the principal character and use of a structure could be changed by "some ancillary or accessory use." *Whatley I*, 906 N.E.2d at 262. Several courts had previously concluded that churches did not violate zoning ordinances by hosting daycare centers, coffeehouses, religious book and audiovisual centers, and even a ten acre camp that housed a hotel building and thirty-six cottages. In each instance, the basic purpose of the structure or land was faith-based and the other uses were considered too "accessory or incidental" to change the character of the church property. *Whatley I*, 906 N.E.2d at 263. Noting that all of the programs produced for youth at the Robinson Community Church were faith-based, the court of appeals concluded that the structure "was and remains a church and is not converted into a youth program center by reason of its faith-based activities for young people." *Whatley I*, 906 N.E.2d at 263. The court therefore reversed the conviction, remanded for entry of a Class C felony conviction and ordered that Whatley be re-sentenced accordingly.

The State sought and was granted review in the Indiana Supreme Court. In a three-to-two decision, the high court

reversed the court of appeals and reinstated Whatley's Class A conviction. *See Whatley v. State*, 928 N.E.2d 202 (Ind. 2010) (hereafter "*Whatley II*"). The court first considered Whatley's argument that the statute defining "youth program center" was unconstitutionally vague as applied to him because there was no way to know that he was near an unmarked youth program center in the absence of a bright-line rule for what structures would trigger the sentencing enhancement. The high court agreed with the appeals court that strict liability applied to the statute under *Walker v. State*, 668 N.E.2d 243 (Ind. 1996). But the high court remarked that Whatley's vagueness claim could not be resolved solely on the basis of the strict-liability nature of the statute.

*Walker*, the court noted, resolved whether there was a *mens rea* requirement for the school-zone sentencing enhancement, but the need for proof of *mens rea* "is not the same as the constitutional requirement against vagueness." *Whatley II*, 928 N.E.2d at 205. Rather, the court acknowledged, for a statute to avoid constitutional infirmity on vagueness grounds, it "must provide a person of ordinary intelligence with notice of what conduct is prohibited." *Whatley II*, 928 N.E.2d at 205. The court then addressed the specifics of Whatley's vagueness argument:

> Whatley's vagueness claim focuses on the statute's requirement that programs or services be provided on a "regular" basis. While it is true that "regular" is susceptible to numerous meanings, the Constitution does not demand a statute free of ambiguities, but instead one that will put a person of ordinary intelligence on notice or provide objective criteria for determining whether one is within a protected area.

… There are likely hypothetical scenarios in which the definition of "youth program center" would be unconstitutionally vague, but vagueness challenges are challenges that statutes are unconstitutional as-applied, not on their faces. … Here, Whatley could have objectively discovered RCC's status as a youth program center by observing young people entering and exiting the building on a regular basis—in fact, his residence faced RCC's entrance. Whatley could have contacted RCC to inquire whether programs were offered for youth on a regular basis. And under *Walker*, it is of no import here that Whatley was unaware of the existence of a youth program center. It is, therefore, not dispositive that RCC did not have a sign indicating it was a youth program center, or that Whatley did not realize that RCC regularly provided services and programs to young people; an objective observer could discern that the activities occurring at RCC qualified it as a youth program center by observing children entering and exiting the building on a regular basis or by contacting RCC to determine whether it offered programs to young people on a regular basis. The statute is not vague as applied to these facts.

*Whatley II*, 928 N.E.2d at 206. The court also rejected Whatley's challenge to the sufficiency of the evidence and to the length of his sentence. The court vacated the opinion of the court of appeals and affirmed Whatley's conviction and thirty-five year sentence.

The two dissenting justices of the Indiana Supreme Court noted that the statute provided a "dramatic enhancement" of an offender's sentence for possession of drugs on a school bus or near school property, a public park, a family housing complex or a youth program center. The dissenters remarked at the absence from this list of the terms "church" or "house of worship" or any other language that would plainly include the Robinson Community Church. "Nor is there anything in this record indicating that the exterior of the Church revealed the nature or regularity of its youth programs." *Whatley II*, 928 N.E.2d at 209 (Boehm, J., dissenting).

The dissenting justice reasoned:

> I agree with the majority that the statutory definition of "youth program center" as a structure "that on a regular basis provides ... programs or services" for people under age eighteen turns only on the activities "provided" by the structure. I.C. § 35–41–1–29. But in my view that definition must be confined to comply with basic principles of due process of law. Due process requires that a criminal statute give everyone reasonable notice of what is prohibited. *Healthscript, Inc. v. State*, 770 N.E.2d 810, 813 (Ind. 2002). It also requires notice of the consequences of violation so the facts warranting the enhanced penalty at issue here are equally subject to the requirement of fair notice. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *Coleman v. Ryan*, 196 F.3d 793, 797 (7th Cir. 1999) (" '[T]he notice requirements of the Due Process Clause' require that a criminal law 'clearly

define the conduct prohibited' as well as 'the punishment authorized.' A statute is constitutionally defective if it 'do[es] not state with sufficient clarity the consequences of violating a given criminal statute.' " (quoting *Batchelder*, 442 U.S. at 123, 99 S.Ct. 2198)); *United States v. Samaniego–Rodriguez*, 32 F.3d 242, 244 (7th Cir. 1994) ("The fair notice requirement of the Due Process Clause is satisfied if the criminal statute clearly defines the conduct prohibited and the punishments authorized.").

I agree with the majority that there are many buildings that are easily identified as housing "regular … programs or services" for persons under age eighteen. But the statute under the majority's rationale here looks only to the activities conducted in the structure to determine whether it is a youth program center, and not to whether a casual observer could readily discern that the structure provides those services. This reasoning would make a youth program center of every residence housing a Cub Scout weekly meeting. Any other building could become a "youth program center" regardless of its appearance or signage. I would confine the term as the legislature has written it to those structures identifiable from their appearance as likely to house youth programs. These would include Boys and Girls Clubs, YMCAs, YWCAs, sports facilities and the like, but not structures principally identified with other activities, at least without some external

> signage or other clear indication that the structure houses regularly conducted youth programs.
>
> The State makes no claim that the structure here was readily identifiable as a youth program center. Rather, the State argues that this enhancement applies irrespective of the appearance of the structure. Because I disagree, I believe the Court of Appeals correctly held that the enhanced sentence should be set aside.

*Whatley II*, 928 N.E.2d at 209.

After losing on direct appeal, Whatley filed post-conviction proceedings in Indiana. The post-conviction trial court ruled against him as did the court of appeals. The Indiana Supreme Court declined further review. Whatley then filed a *pro se habeas corpus* petition in the Southern District of Indiana. As is often the case with *pro se* petitioners, Whatley's description of his issues was not a model of clarity. In his petition, Whatley contended (among other things) that he was denied due process under the Fourteenth Amendment to the U.S. Constitution when the state court made an "unreasonable determination of fact declaring that Robinson Community Church was a Youth program center." R. 8, at 6. In briefing the issue, Whatley clarified the issue by citing to the Indiana Supreme Court dissenters and arguing that the statute violated due process because "[l]aws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid." R. 17, at 8. Whatley noted that the statute did not include the terms "church" or "place of worship" or any other language that would put a person on notice that the

Robinson Community Church would be considered a youth program center. Citing *United States v. Batchelder*, 442 U.S. 114 (1979), Whatley contended that due process also requires that persons be placed on notice of the consequences of violating a particular law. Due process, Whatley continued, requires that a criminal law clearly define the conduct prohibited as well as the punishment authorized. Whatley asserted that there were no youth programs being held on the night of his arrest, that the church did not hold youth programs on a daily basis, that the church was not readily identifiable as a youth program center, and that the Indiana Supreme Court's conclusion that the church qualified as a youth program center was an unfair determination.

The district court declined to address Whatley's claims on the merits. *Whatley v. Zatecky*, 2014 WL 2511585 (S.D. Ind. June 4, 2014) (hereafter "*Whatley III*"). Noting that state prisoners seeking federal *habeas* review must first fully and fairly present their federal claims to the state courts, the court concluded that Whatley procedurally defaulted his federal claim regarding the definition of "youth program center." The court also denied Whatley's request for a certificate of appealibility. Whatley then sought review in this court and we granted a certificate of appealability:

> We find that Whatley has made a substantial show-ing of the denial of a constitutional right as to whether the statute enhancing his sentence was unconstitutionally vague.

R. 34, Order (Sykes, J.).

**II.**

On appeal, Whatley contends that his claim should be reviewed *de novo* rather than under the usual deferential standard proscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1); that his conviction violated the due process clause because the "youth program center" provision of the statute was impermissibly vague; and that he did not procedurally default his claim.[5] The State responds that Whatley's vagueness claim is procedurally defaulted; that even if the claim is preserved, the decision of the Indiana Supreme Court is entitled to deference under the AEDPA; and that nothwithstanding that deference, Whatley's vagueness challenge fails on the merits.

**A.**

We review *de novo* the question of procedural default. *Richardson v. Lemke*, 745 F.3d 258, 269 (7th Cir. 2014). "Before a federal court may grant *habeas* relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a *habeas* petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(1). *See also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). This requires the petitioner to fairly present his federal claim to the state courts through one complete round of state court review, whether on direct appeal or in post-conviction proceedings. *Richardson*, 745 F.3d at 268;

---

[5] Whatley asserts in the alternative that he should prevail even if the claim is reviewed with deference under the AEDPA.

*Bolton v. Akpore*, 730 F.3d 685, 694 (7th Cir. 2013). "At bottom, we must consider whether 'the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis.'" *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)). *See also Duncan v. Henry*, 513 U.S. 364, 365 (1995) (the exhaustion requirement provides a state an opportunity to pass upon and correct alleged violations of its prisoners' federal rights). We have set forth four factors to consider in determining whether a petitioner has avoided default: (1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; or (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Smith v. Brown*, 764 F.3d 790, 796 (7th Cir. 2014) (citing *Ellsworth*, 248 F.3d at 639). All four factors need not be present to avoid default, and conversely, a single factor alone does not automatically avoid default. *Wilson v. Briley*, 243 F.3d 325, 327-28 (7th Cir. 2001); *Verdin v. O'Leary*, 972 F.2d 1467, 1473-74 (7th Cir. 1992). We must consider the specific circumstances of each case.

Before we turn to the four-factor test, we note that the analysis of a due process vagueness challenge under the Indiana Constitution and the U.S. Constitution is identical, and the Indiana courts rely on the same cases and standards in ruling on these challenges. *See Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007) (citing both state and federal cases for identical

standards in analyzing a vagueness challenge to a state criminal law); *Pittman v. State*, 45 N.E.3d 805, 816 (Ind. Ct. App. 2015) (same); *Jackson v. State*, 634 N.E.2d 532, 535 (Ind. Ct. App. 1994) (same). *See also Reed v. State*, 720 N.E.2d 431, 433-34 (Ind. Ct. App. 1999) (addressing both federal and state constitutional vagueness challenges to Indiana's drug zone enhancement statute by relying on state cases that apply the standard articulated by federal courts). Because the standards and analysis are identical, even if we were to assume that the Indiana courts addressed Whatley's challenge only under state law, the courts also necessarily addressed Whatley's claim as a matter of federal law. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits."); *Falconer v. Lane*, 905 F.2d 1129, 1134 (7th Cir. 1990) ("if a defendant presents the state courts with a state claim that is functionally identical to a federal claim, then we must regard the federal claim as fairly presented."). When the state and federal analyses are identical, it can be fairly said that the state has had an opportunity to resolve the issue on the merits, as happened here.

But we need not rely on the indistinguishable nature of the state and federal vagueness analysis because Whatley fairly presented the federal nature of his claim to the Indiana courts.[6]

---

[6] Under the Indiana Rules of Appellate Procedure, when the Indiana Supreme Court grants a petition to transfer, it then decides the case based on the briefs originally submitted to the Indiana Court of Appeals. Ind. R.

(continued...)

First, Whatley consistently framed his vagueness challenge in terms so particular as to call to mind a specific federal constitutional right. In particular, he argued that the statute was unconstitutionally vague as applied to him because "the statute forbids conduct in terms so vague that persons of ordinary intelligence must necessarily guess at the statute's meaning and differ as to its application." R. 16-3, Brief of Appellant, at 5. This language closely tracks the federal standard for a due process vagueness claim beginning with the Supreme Court's analysis in 1926 and continuing to this day. *See Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (quoting *Connally* for the vagueness standard); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."); *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (holding that the government violates the due process clause of the Fifth Amendment when it takes "away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the

---

[6] (...continued)
App. Pro. 58(a). Thus the Supreme Court evaluated Whatley's claims based on the same briefs he presented to the Court of Appeals.

conduct it punishes, or so standardless that it invites arbitrary enforcement").

Whatley also alleged a pattern of facts that is well within the mainstream of constitutional litigation. He cited the broad and subjective language of the statute, noted that no Indiana court had limited that language in a manner that would give fair notice of what conduct was prohibited, and then argued that the statutory definition of the phrase "youth program center" gave no basis for individuals to know that they were within the proscribed zone. Although Whatley cited no federal cases, he relied on state cases that engaged in federal constitutional analysis. And the two Indiana courts that analyzed his claim on direct appeal relied on federal cases and on state cases that addressed federal vagueness challenges. Finally, we note that the two Indiana courts to consider Whatley's claims both recognized that he had raised a due process vagueness claim and both courts addressed that claim on the merits. There is no doubt, therefore, that the courts were alerted to the federal nature of Whatley's vagueness challenge.

Moreover, Whatley also adequately conveyed to the Indiana courts his specific vagueness objection to the statute. The courts expressly understood that Whatley was challenging the vagueness of the term "regular" in the definition of "youth program center." Although the Indiana Court of Appeals ultimately decided the case on another issue, the court characterized the children's activities at the church as "ancillary" and "accessory" and found that the activities were too incidental to change the character of the structure from that of a church to that of a youth program center. Words such as "ancillary," "accessory," and "incidental" are necessarily in contrast to

"regular" uses of the structure. The Indiana Supreme Court also homed in on the import of the word "regular" in addressing Whatley's challenge to the statute on vagueness grounds. As we noted above, the court acknowledged that the word "regular" was susceptible to multiple meanings, but nevertheless concluded that the statute provided adequate notice to avoid a vagueness challenge. The state courts were fairly apprised that Whatley was bringing a constitutional vagueness challenge to the statute, that his challenge focused on the definition of "youth program center," and that within that definition, he was asserting the vagueness of the term "regular." The district court therefore erred when it concluded that Whatley had defaulted his federal claims.

## B.

A court may consider a state prisoner's application for *habeas* relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court proceed-
> ing.

28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011). Whatley's claim proceeds under the "unreasonable application" part of the statute. Petitioners face a difficult standard under this provision. "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Richter*, 562 U.S. at 98. The Supreme Court has made clear that an "unreasonable application" of federal law is different from an incorrect application:

> A state court's determination that a claim lacks merit
> precludes federal habeas relief so long as "fair-
> minded jurists could disagree" on the correctness of
> the state court's decision.

*Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Whatley contends that the state courts unreasonably applied the Supreme Court's precedent regarding due process vagueness challenges to criminal statutes. We will address that claim on the merits, but first we must address what level of deference to apply to the state court decisions. Whatley contends that whether a state court unreasonably applied federal law depends on an analysis of the state court's *actual* rationale. The rationale expressed by the Indiana Supreme Court in rejecting his claim, he asserts, was unreasonable because it was circular. As such, he contends that the state

supreme court's decision is entitled to no deference under the AEDPA, and urges us to apply *de novo* review to his claim of vagueness under the due process clause.

In *Richter*, the Supreme Court considered whether and how to apply AEDPA deference in cases where the state court offers no reason for its denial of a claim.[7] In that case, petitioners must demonstrate that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. In particular, when the state court denies the claim on the merits without explanation:

> a habeas court must determine what arguments or theories supported or [as in *Richter*] *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

---

[7] *Richter* addressed both how to determine whether a state court's summary disposition is a decision "on the merits," and what level of deference to apply to such a decision under the AEDPA. *Richter* held, in part, that when "a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 562 U.S. at 99. That presumption is rebuttable. *Id*. at 99-100. There is no question in Whatley's case that the state court decided his claim on the merits and so we consider here only what level of deference to apply to that decision.

*Richter*, 562 U.S. at 102 (emphasis added). So if the state court offered no reason for denying a *habeas* claim on the merits, the federal courts are obligated, under *Richter*, to postulate arguments or theories that *could have supported* the state court's decision and then defer to the bottom-line decision unless it was an unreasonable application of federal law.[8]

Prior to *Richter*, if a state court offered a rationale to support its decision denying *habeas* relief, we assessed the *actual* reason offered by the state court to determine whether the decision was the result of an unreasonable application of federal law. *See Brady v. Pfister*, 711 F.3d 818, 824-25 (7th Cir. 2013). After *Richter*, we began to question:

> first, whether *Richter* (a) applies only to cases in which the state court offers no reasoning, or instead (b) holds in effect that federal courts should always entirely disregard the state court's rationale and decide independently if the bottom line is justifiable; and second, if *Richter* applies only to summary dispositions, how a federal court should evaluate a case in which the state court offers a reason, but that reason is either wrong as a matter of law or patently irrational.

*Brady*, 711 F.3d at 824-25. We noted in *Brady* that, after *Richter* was decided, the Supreme Court addressed some of these open

---

[8] Throughout the opinion, we use the phrase "unreasonable application of federal law," as shorthand for "unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States," the standard set forth in 28 U.S.C. § 2254(d)(1).

issues in *Johnson v. Williams*, 133 S. Ct. 1088 (2013). *Williams* addressed the issue that arises when a state defendant raises a federal claim on either direct appeal or in collateral proceedings, and the state court issues a ruling that addresses some issues but does not expressly address the federal claim. The *Williams* Court extended the holding of *Richter* to that scenario, ruling that the federal *habeas* court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Williams*, 133 S. Ct. at 1091; *Brady*, 711 F.3d at 825. And once the claim is considered adjudicated on the merits by the state court, AEDPA deference must apply to the decision. *Brady*, 711 F.3d at 825-26 ("*Williams* therefore confirms the fact that the state court's reasoning continues to be relevant wherever it has given an explanation, notwithstanding the holding in *Richter*."). According to *Brady*, *Richter* did not change the analysis for *habeas* courts that are presented with a reasoned decision from the state court. *Brady* 711 F.3d at 826. The federal court must still evaluate whether the state court's *conclusion* was contrary to or an unreasonable application of authority from the Supreme Court "in light of the state court's explanation for its holding." *Id*.

Whatley argues that, under *Brady*, we should not apply AEDPA deference to the state court decision when the rationale offered is unreasonable. Whatley may have over-read our opinion in *Brady*, however. The question in Whatley's case is what level of deference to apply to the court's decision: whether we should review his claim *de novo*, whether we should postulate arguments or theories that could have supported his claim, or whether *Brady* requires something else. Brady's case presented a variant on the pattern described in

*Johnson v. Williams*: the state court addressed both parts of Brady's claim for ineffective assistance of counsel and found that counsel's performance was not deficient and that Brady was not prejudiced. We concluded that the state court's reason expressed for the finding on prejudice was wrong. "The problem is thus not silence; it is what to do if the last state court to render a decision offers a bad reason for its decision." *Brady*, 711 F.3d at 826. At that point, we concluded that although we would no longer attach significance to the state court's expressed *reasons*, we would still apply AEDPA deference to the *judgment*:

> Under *Johnson v. Williams* and *Richter*, it is clear that a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine. A state court could write that it rejected a defendant's claim because Tarot cards dictated that result, but its decision might nonetheless be a sound one. If a state court's rationale does not pass muster under the *Williams v. Taylor* standard for Section 2254(d)(1) cases, the only consequence is that further inquiry is necessary.
>
> At that point, it is no longer appropriate to attach any special weight to the last state court's expressed reasons. The court's judgment, however, is another matter. **With the last state court's reasoning set aside, the federal court should turn to the remainder of the state record, including explanations offered by lower courts.** The only question in that situation is whether AEDPA deference applies to those lower state-court decisions, or if review is *de*

*novo*. In close cases, it is conceivable that the choice of standard might make a difference: if the lower courts' reasoning was incorrect, then the result might be set aside on *de novo* review but not (as *Richter* explained) under AEDPA. But it is unlikely that the standard would affect very many cases. It is worth recalling that the pre-AEDPA standard was also quite deferential to the state courts. *See Richter*, 131 S.Ct. at 788 ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."); *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir.2011) ("[W]e review the petitioner's constitutional claim with deference to the state court, but ultimately *de novo*.") (internal quotation marks omitted). If the record as a whole supports the state court's outcome, then even under *de novo* review the correct result would be to deny the petition for a writ of *habeas corpus*.

*Brady*, 711 F.3d at 827 (emphasis added).[9] In Whatley's case, as we will discuss below, the level of deference that we apply to the state court decisions does not change the outcome. But contrary to Whatley's assertion, *Brady* does not entitle a petitoner to *de novo* review simply because the state court's rationale is unsound.

---

[9] In *Williams v. Taylor*, 529 U.S. 362, 413 (2000), the Supreme Court held that "[u]nder the 'unreasonable application' clause, a federal *habeas* court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

**C.**

**1.**

With those standards in mind, we turn to the substance of Whatley's claim. Whatley contends that the statute is impermissibly vague because it defines "youth program center" as a facility with "regular" youth programs, and "regular" is a word with multiple, inconsistent constructions. According to Whatley, no reasonable person could have known which facilities the state would deem "youth program centers," or that the state would consider the Robinson Community Church to meet the definition. The church, he notes, hosted children's events for a few hours at a time, a few days each week. In contrast, facilities such as YMCAs or Boys and Girls Clubs provide youth events constantly, or at least as a normal part of their programming. These types of facilities lie at the core of the "school-zone" statute, according to Whatley, and the statute's use of the word "regular" provided no discernable standard for defendants, prosecutors, judges or juries to apply to facilities outside that core.

Turning to dictionary definitions of the word "regular," Whatley contends that it can mean periodic, constant, or normal, and he offered examples of each.[10] "Periodic" events may occur as seldom as a once-a-year children's parade at a mall, for example, and still meet the dictionary definition of regular. "Constant" programming might include facilities that

---

[10]  Whatley relied on the American Heritage Dictionary (2d college ed. 1985), the Oxford English Dictionary (2d ed. 1989), and the New Oxford American Dictionary (2001).

hold hours of youth events every day, but not necessarily on a schedule, such as an arcade or a library offering unscheduled story-reading at the request of children. Finally, "normal" programming would include facilities such as a children's museum or youth sports facility but would not include a general museum or exercise facility. In sum, Whatley contends that no reasonable person could know how many events of what frequency would transform a facility from its primary function into a "youth program center." The statute therefore failed to give fair notice of the conduct prohibited and allowed for completely arbitrary enforcement of the law.

**2.**

Because Whatley must demonstrate that the Indiana courts unreasonably applied clearly established federal law as determined by the Supreme Court, we turn to the Supreme Court's pronouncements on vagueness under the due process clause. As we noted above, *Connally* was among the first cases to discuss what level of specificity the due process clause requires for criminal statutes:

> That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

> guess at its meaning and differ as to its application
> violates the first essential of due process of law.

*Connally*, 269 U.S. at 391. Subsequent decisions have expounded on this language, holding that, to avoid a finding of unconstitutional vagueness, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender*, 461 U.S. at 357; or it must "give ordinary people fair notice of the conduct it punishes," and not be "so standardless that it invites arbitrary enforcement," *Johnson*, 135 S. Ct. at 2556. Under all of these formulations, there are two ways in which a statute may fall short of the mark: it may fail to give a person of ordinary intelligence fair notice of what conduct is prohibited, or it may be so lacking in standards that it invites arbitrary enforcement. These principles apply not only to statutes defining the elements of crimes, but also to statutes fixing sentences, such as the one at issue here. *Johnson*, 135 S. Ct. at 2557; *Batchelder*, 442 U.S. at 123.

The Supreme Court has also held that the level of specificity required for a statute varies based on the possible consequences for violators:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. … The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). And so statutes involving business regulations or other civil matters need not be as precise as those which impose criminal penalties or those that may infringe on constitutional rights. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (for regulatory statutes governing business activities, greater leeway is allowed in statutory language for fair notice of the offending conduct); *Johnson*, 135 S. Ct. at 2560 ("Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process."); *Flipside*, 455 U.S. at 499 ("perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

For Whatley, or indeed for any person convicted under the "youth program center" provision, the consequences were especially dire: without the sentencing enhancement, Whatley faced a maximum of eight years imprisonment. With the enhancement, the maximum rose to fifty years, and he ultimately received a sentence of thirty-five years, more than four times longer – twenty-seven years longer – than the sentence he could have received without the enhancement.[11] It was

---

[11] Interestingly, in 2012, the Indiana Supreme Court twice intervened in drug-free-zone sentencing enhancement cases to mitigate the harsh effect of the law. *See Abbott v. State*, 961 N.E.2d 1016 (Ind. 2012) (finding the

(continued...)

therefore vitally important for Whatley to be able to understand what conduct was prohibited, and equally critical for the statute to embody some discernable standard that would preclude arbitrary enforcement by police officers, judges and juries. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.").

**3.**

As we noted above, Whatley brings his claim under the "unreasonable application" part of the *habeas* statute. Under *Williams v. Taylor*, we must analyze his claim by looking to the state court opinion to see if it identifies the correct legal principle and then consider whether it unreasonably applies it to the case at hand. 529 U.S. at 413; *Brady*, 711 F.3d at 826. The Indiana Supreme Court correctly identified, in part, the Supreme Court's test for constitutional vagueness, namely, whether the statute "provide[s] the person of ordinary intelligence with notice of what conduct is prohibited." *Whatley II*, 928 N.E.2d at 205. The court also opined that the Constitution does not require a statute free of ambiguity but instead one that imparts fair notice or provides objective criteria for determining whether one is in a protected area. The court correctly rejected the legal reasoning of the Indiana Court of

---

[11] (...continued)
sentence too harsh because the decision of a police officer to stop the defendant's car in a particular location led to the enhanced sentence); *Walker v. State*, 968 N.E.2d 1292 (Ind. 2012) (same).

Appeals, which had concluded that fair notice was not re-
quired because the statute applied strict liability to the sentenc-
ing enhancement, an issue we will address below.

But in applying these well-settled principles to the case at
hand, the Indiana Supreme Court erred. The court correctly
acknowledged that Whatley's vagueness claim focused on the
statute's requirement that youth programs be provided on a
"regular" basis, and the court agreed with Whatley that the
term "regular" is susceptible to numerous meanings. But in
attempting to apply the fair notice rule and extract some
objective standard from the word "regular," the state's high
court engaged in a circular analysis:

> Here, Whatley could have objectively discovered
> RCC's status as a youth program center by observ-
> ing young people entering and exiting the building
> on a regular basis—in fact, his residence faced
> RCC's entrance. Whatley could have contacted RCC
> to inquire whether programs were offered for youth
> on a regular basis. And under *Walker*, it is of no
> import here that Whatley was unaware of the
> existence of a youth program center. It is, therefore,
> not dispositive that RCC did not have a sign indicat-
> ing it was a youth program center, or that Whatley
> did not realize that RCC regularly provided services
> and programs to young people; an objective ob-
> server could discern that the activities occurring at
> RCC qualified it as a youth program center by
> observing children entering and exiting the building
> on a regular basis or by contacting RCC to deter-
> mine whether it offered programs to young people

> on a regular basis. The statute is not vague as applied to these facts.

*Whatley II*, 928 N.E.2d at 206.

It was no answer at all to say that Whatley could have "objectively" determined if the Robinson Community Church qualified as a youth program center by observing young people entering the building "on a regular basis" or by calling to ask if the church held children's programs "on a regular basis." This tautology failed to answer the salient question of what the statute meant by "regular." The court's analysis pointed to no objective criteria for a reasonable person to determine whether a particular facility qualified under the statute – that is, to determine whether a facility hosted youth programs on a regular versus an irregular basis – and instead delegated to the defendant or the facility itself the determination of whether its youth programs were held on a regular basis. This circular analysis of a subjective and standardless term was both incorrect and unreasonable under Supreme Court precedent that requires criminal statutes to be based on discernable standards. *See e.g. Johnson*, 135 S. Ct. at 2556; *Kolender*, 461 U.S. at 357; *Grayned*, 408 U.S. at 108-09. Especially in light of the magnitude of the consequences for defendants charged under the sentencing enhancement, the court should have limited or applied some discernable standard to the amorphous word "regular" so that persons of ordinary intelligence could identify youth program centers as such.

But as our decision in *Brady* instructed, that is not the end of the analysis. If the last state court to reach the issue offered a "bad reason" for denying a claim, the federal court consider-

ing the *habeas* petition need not attach any special weight to the last state court's expressed reasons, but should turn to the remainder of the state record, including explanations offered by lower courts. *Brady*, 711 F.3d at 827. Under *Richter* and *Brady*, if the record as a whole supports the state court's outcome, then the "correct result would be to deny the petition for a writ of *habeas corpus*." *Brady*, 711 F.3d at 827.

So we turn to the record as a whole. That includes the state trial court record as well as the ruling of the Indiana Court of Appeals, which found in Whatley's favor, albeit on different grounds. In its instructions, the state trial court gave the jury only the language of the statute, and limited that language to exclude the other types of facilities that qualify for the sentencing enhancement. Thus, the jury was presented with the statutory definition of "youth program center" and a directive that it applied to a defendant who possessed more than three grams of drugs within 1000 feet of a youth program center. The jury was also presented with evidence that the church held as few as four and as many as six children's programs each week. That is, essentially, the entire trial record on this issue.

The Indiana Court of Appeals, like the state's high court, stated the correct rule governing Whatley's vagueness challenge: the statute must give fair notice of the conduct proscribed, in this case possessing a controlled substance within 1000 feet of a youth program center. The court noted Whatley's concession that the other types of facilities mentioned in the statute – school buses, schools, parks and family housing complexes – presented no vagueness problem because each was easily identified as such. The court also understood Whatley's objection to be that, in the absence of any bright line

rule or standard, no person of ordinary intelligence could
identify a youth program center that bore no external identifi-
cation of its nature. But in applying the standard for vagueness
to the sentencing law, the appeals court also took a wrong turn.
The court rejected Whatley's vagueness claim because the
Indiana Supreme Court had previously determined that the
sentencing enhancement statute lacked a *mens rea*
requirement.[12] Because a defendant was strictly liable under
the statute, the court of appeals reasoned, there was no need
for "fair notice."

Perhaps the Indiana Court of Appeals felt constrained by
prior holdings of the state's supreme court and appellate court
that the sentencing enhancement statute was not imper-
missibly vague in the context of schools and family housing
complexes, and that strict liability applied. *Manigault v. State*,
881 N.E.2d 679 (Ind. Ct. App. 2008) (statute not vague in
context of family housing complex); *Polk v. State*, 683 N.E.2d
567, 572-73 (Ind. 1997) (statute not vague in context of school);
*Walker*, 668 N.E.2d at 244-45 (strict liability applies to the
sentencing enhancement). But the appellate court's conclusion
that fair notice is not required for strict-liability statutes is
inconsistent with Supreme Court precedent that requires fair
notice for *all* criminal statutes.

Strict liability in this instance means only that a defendant
need not know that she is within 1000 feet of a prohibited

---

[12] Indiana's drug possession law requires proof of intent but the Indiana
Supreme Court determined that defendants would be strictly liable under
the sentencing enhancement portion of the statute. *See Walker v. State*,
668 N.E.2d 243, 244-45 (Ind. 1996).

place. But the due process clause requires that she know which places are prohibited; that is, a person of ordinary intelligence must be able to identify a youth program center as such. This is so because a statute violates due process when it does not allow a defendant an opportunity to conform his conduct to the law:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).[13] The lack of an intent element in the statute does not cure the vagueness problem; it makes it worse by making unknowing defendants absolutely liable for violating an indeterminate standard.

In fact, if a statute does not specify with sufficient particularity what conduct is prohibited, the Supreme Court has repeatedly held that imposing an intent requirement on an otherwise vague statute could save a law from a finding of impermissible vagueness. *See Flipside*, 455 U.S. at 499 ("And the Court has recognized that a scienter requirement may mitigate

---

[13] The State has argued that, because the sentencing enhancement statute applies only to defendants who are already violating the law, there is no risk of trapping the innocent. But the Supreme Court has held that the same due process vagueness principles apply to both statutes defining elements of crimes and also to statutes fixing sentences. *Johnson*, 135 S. Ct. at 2557; *Batchelder*, 442 U.S. at 123.

a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (collecting cases and noting that the "Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."). *See also Server v. Mizell*, 902 F.2d 611, 614 (7th Cir. 1990) (scienter requirement may mitigate the vagueness of a law). The Indiana Court of Appeals' holding to the contrary turned that logic on its head. If applied literally, the appeals court's analysis would mean that strict liability statutes could never be vague because defendants need not know what conduct is prohibited. But holding defendants strictly liable for indeterminate offenses would be contrary to every Supreme Court vagueness case we have cited above.

The appeals court nevertheless ruled in Whatley's favor by turning to zoning law to limit the application of the sentencing statute. The court determined that the nature of the Robinson Community Church could not be transformed into a youth program center by "accessory" or "incidental" events held for children. The church remained a church, the appeals court held, and it reversed the judgment. Although the result was in Whatley's favor, it was based on state law analysis and adds nothing to our federal due process analysis.

**4.**

Under *Richter* and *Brady,* nothing in the record of the Indiana courts supports the state court's outcome. We are left with a circular analysis of Whatley's vagueness challenge from the Indiana supreme court ("regular" means "regular") and

upside-down reasoning from the court of appeals (no fair notice is required for a strict liability statute). Under *Williams v. Taylor*, that would be enough to grant the writ because this reasoning is not simply incorrect; it is unreasonable. *See Williams*, 529 U.S. at 413 ("[u]nder the 'unreasonable application' clause, a federal *habeas* court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.").

For the sake of completeness, we have also considered "what arguments or theories … could have supported, the state court's decision," and we conclude that there are no arguments or theories that a fairminded jurist would believe are consistent with Supreme Court precedent and that could have supported the state court's decision. *Richter*, 562 U.S. at 102; *Stitts v. Wilson*, 713 F.3d 887, 893 (7th Cir. 2013).

The State urges us to find that Whatley's claim must fail because there is no Supreme Court case holding that the term "regular" is unconstitutionally vague. This argument seriously misapprehends the operation of the AEDPA. The Supreme Court has held in general terms that a criminal law violates the guarantee of due process when the law is so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Johnson*, 135 S. Ct. at 2556. "That the standard is stated in general terms does not mean the application was reasonable." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

> AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before

> a legal rule must be applied." … Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts "different from those of the case in which the principle was announced." … The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner. … These principles guide a reviewing court that is faced, as we are here, with a record that cannot, under any reasonable interpretation of the controlling legal standard, support a certain legal ruling.

*Panetti*, 551 U.S. at 953 (internal citations omitted). We need not wait for a Supreme Court case analyzing the word "regular." We may rely on cases where the Court evaluated statutes employing other similarly subjective terms that failed to fix "an ascertainable standard of guilt," forbade "no specific or definite act," or left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).

The State next points to cases that it asserts have upheld the term "regular" against vagueness challenges. But the statute in each case that the State cites uses the word "regular" in conjunction with some other limiting language that provides a standard, gives fair notice to ordinary people, and cabins arbitrary enforcement. Moreover, none of the statutes employ strict liability, and one is a statute regulating business activity, a category where the Court allows less precision in the language. *See 511 Detroit Street, Inc. v. Kelley*, 807 F.2d 1293 (6th Cir. 1986) (finding an obscenity statute not vague when it

punishes a knowing dissemination of obscene materials that comprise "a predominant and regular part of the person's business" and a "principal part or substantial part of the stock in trade" of that business); *Britt v. State*, 775 So.2d 415, 416-17 (Fla. Ct. App. 2001) (upholding against a vagueness challenge a statute that prohibited defendant from living or working within 1000 feet of "a school, daycare center, park, playground, or other place where children regularly congregate" because the last location was to be read in conjunction with the list preceding it);[14] *Haviland Hotels Inc. v. Oregon Liquor Control Comm'n*, 530 P.2d 1261, 1263 (Or. Ct. App. 1975) (finding that Liquor Control Commission business regulation requiring licensees to "provide regular meals during the usual hours when such meals are regularly served" was not vague because there was a "clear, grassroots connotation" to the phrase in light of the history of the regulation).

The State also faulted Whatley for citing no case in which the term "youth program center" has been held unconstitutionally vague even though a federal statute and other state laws employ similar terms. *See* Alaska Stat. § 11.71.030; Cal. Health & Safety Code § 11353.1; D.C. Code §§ 22-4501, 22-4502.01; La. Rev. Stat. 15:538; Miss. Code § 41-29-142; S.D. Unified Laws § 22-42-19; Tex. Health & Safety Code § 481.134; Wis. Stat. §§ 961.01, 961.49; and 21 U.S.C. § 860(e)(2). First, it is irrelevant

---

[14] This was the very theory that caused Whatley's trial lawyer to ask the court to read the entire statute to the jury, so that they could read the term "youth program center" in conjunction with the rest of the list. The trial court's refusal to give the complete language of the statute was one of several ways that the Indiana courts could have limited the unbounded and ill-defined reach of the law.

that no one has challenged the statutes of other states or the federal government. It is the particular language of the Indiana statute that is at issue here, and more importantly the unique circumstances of its application to Whatley.

Second, each and every statute cited by the State is distinguishable from the Indiana statute. Several of the statutes (Alaska, Louisiana and Mississippi) do not rest the definition of "youth center" or "youth program center" on the standardless word "regular." None of the statutes purport to apply strict liability to the proscribed conduct and several (Alaska, South Dakota and Wisconsin) expressly include an intent element. Several of the statutes (federal, California, District of Columbia, South Dakota and Texas) use limiting words in conjunction with the definition of youth center, requiring, for example, that the facility be used "primarily" for youth activities or that the facility is a recreational center or gym primarily intended for use by children. One statute (District of Columbia) actually limits its application to facilities that are "appropriately identified" as a prohibited zone with a sign.

Third, the State points to no instance of any of these other statutes being used to charge a defendant who committed a crime near a community church that held four children's events for a few hours each week. And finally, none of these statutes increase the penalty for the underlying crime more than four-fold, an especially dire consequence with a strict liability statute such as the one in Indiana. In contrast, two federal courts have concluded that the term "regular" by itself is too vague to pass constitutional muster. *Does 1-5 v. Snyder*, 101 F. Supp. 3d 672, 687-88 (E.D. Mich. 2015) (the word "regularly" both fails to provide fair notice of the conduct

proscribed and is imprecise enough to invite arbitrary enforcement); *Does 1 - 5 v. Cooper*, 40 F. Supp. 3d 657, 684 (M.D.N.C. 2014) (finding the phrase "regularly scheduled educational, recreational, or social programs" unconstitutionally vague because, among other reasons, there is no indication how often such programming must occur in order to be "regularly scheduled").

Finally, the State argues that a person of ordinary intelligence would understand that the number of youth programs held at the Robinson Community Church were sufficient to render it a youth program center. This is essentially an argument that the church held so many programs that it would meet any definition of "regular," and that Whatley's case is in the core of the conduct prohibited by the statute.[15] But four or six activities a week at a facility that is not otherwise identifiable as a youth program center is nowhere near the core of the statute. Had Whatley possessed drugs within 1000 feet of a YMCA or a Boys and Girls Club, there would be no doubt that his conduct was within the core of the law. The State conceded in its argument to the Indiana Supreme Court that churches are not inherently places where children gather, and a handful of

---

[15] In *Johnson*, the Supreme Court remarked that "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 135 S. Ct. at 2561. In analyzing the vagueness of a federal sentencing statute, the Court also noted that "If we hold a statute to be vague, it is vague in all its applications[.]" *Id*. Whatley argued to the state courts that the law was vague "as applied" to him and so we will nevertheless consider the State's argument that Whatley's conduct fell within some constitutional core of the statute.

weekly events does nothing to provide fair notice or to discourage arbitrary enforcement of the statute.

We twice asked the State at oral argument how many events each week would qualify as "regular," so as to bring a facility within the limits of the law. The State twice responded, "four." Oral Argument, at 9:08-9:21 and 16:17-16:26. But the State provided no basis for that arbitrary and convenient number, which coincidentally matched the minimum number of children's activities held at the Robinson Community Church each week. Without any standard in the statute, in a regulation, or in the Indiana case law, the completely subjective word "regular" invited arbitrary enforcement of this strict liability statute. *Grayned*, 408 U.S. at 108–09 ("if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."). "The dividing line between what is lawful and unlawful cannot be left to conjecture." *Connally*, 269 U.S. at 393. But with the wording of Indiana's statute, a defendant must rely on little more than conjecture to determine what will transform an unmarked building used for some other purpose into a "youth program center."

Indeed, before repealing this part of the statute, the Indiana legislature heard testimony from a law school professor and her students who analyzed the effect and reach of the statute.[16] In mapping out the geographic coverage of the law, Professor Kelsey Kauffman and her students limited their analysis to

---

[16] *See* Testimony Before the Sentencing Policy Study Committee, Oct. 8, 2008, at http://dpuadweb.depauw.edu/$1~kkauffman/newdrugzonelaws/Testimony.html (last visited July 29, 2016).

schools, parks and housing complexes, expressly leaving "youth program centers" out of the evaluation because:

> Neither we nor, we assume, most drug dealers could determine exactly what constitutes a youth program center, much less locate all of them in Indianapolis.

*Id.* Professor Kauffman explained that the purpose of drug-free zones is to protect children from drugs, and that drug offenders must therefore be able to know where the zones are so that they can make "a rational choice to avoid them due to the special penalties." *Id.* If offenders do not know where the zones are, Professor Kauffman explained, the effectiveness of the zones is undermined. The professor ultimately recommended eliminating "youth program centers" from the statute, and the legislature subsequently adopted that recommendation, albeit too late for Whatley.[17]

The remainder of the State's arguments are equally unavailing. In spite of the Supreme Court's pronouncement in *Batchelder* and *Johnson* that the vagueness doctrine applies to sentencing laws, the State insists vagueness is not a problem here because Whatley was already engaged in a criminal act when the State determined that he did so within the 1000 foot perimeter. That is simply not the law. *Johnson*, 135 S. Ct. at

---

[17] The current version of the drug-free zone statute applies only to drug offenses committed on a school bus, or within five hundred feet of school property or a public park while a person under eighteen years of age was reasonably expected to be present. Ind. Code 35-48-1-16.5. In addition to eliminating youth program centers and family housing complexes from the law, the enhanced penalties apply only to offenses involving more than five grams of cocaine. Ind. Code 35-48-4-6.

2557. One of the dissenters in *Johnson* took the position that the vagueness "bar is even higher for sentencing provisions" because there is no danger of trapping the innocent. *Johnson*, 135 S. Ct. at 2577 (Alito, J., dissenting). The majority rightly rejected that reasoning because due process requires that the statute give a person an opportunity to conform his conduct to the law, a requirement that applies with equal force to the conduct used to enhance a sentence. *Grayned*, 408 U.S. at 108–09. The State's other arguments depend on the patently erroneous assertion that there is no need for fair notice in a strict liability statute.

## D.

In sum, a triad of factors convince us that the state courts were not simply wrong but unreasonable in applying federal law on vagueness in Whatley's case: (1) the use of the word "regular" in the definition of "youth program center" provides no objective standard, and thereby fails to place persons of ordinary intelligence on notice of the conduct proscribed and allows for arbitrary enforcement; (2) defendants are strictly liable for violating the terms of this nebulous sentencing enhancement, exacerbating the effect of the subjectivity; and (3) the consequences of violating this indeterminate strict liability provision are extreme: an increase in the sentencing range from 2-to-8 years to 20-to-50 years' imprisonment. The Indiana courts failed to narrow the statute by adding an intent element, by limiting application to the core cases of facilities such as YMCAs or Boys and Girls Clubs, or by providing any objective standard to the meaning of "regular." There was no "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. As applied to Whatley, the statute delegated to

the police, the prosecutor and the jury the task of determining what conduct was proscribed. No one in Whatley's position could have known that the Robinson Community Church would fall within the definition simply because it hosted a handful of children's events each week and otherwise bore no indicia of the children's activities within. We therefore reverse and remand the judgment, with instructions to grant the writ of *habeas corpus* ordering that, within sixty days, Whatley either be released or that he be re-sentenced under the Class C felony statute. If he is re-sentenced, he must, of course, be given credit for the time he served under the Class A felony conviction.

REVERSED AND REMANDED.