FILED

Dec 19 2019, 9:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Jonathan O. Chenoweth
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ricci Davis,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

December 19, 2019

Court of Appeals Case No.
19A-PC-984

Appeal from the Huntington
Superior Court

The Honorable Jennifer Newton,
Judge

Trial Court Cause No.
35D01-1511-PC-22

**Brown, Judge.**

[1] Ricci Davis appeals the denial of his petition for post-conviction relief. We affirm.

*Facts and Procedural History*

[2] The relevant facts as discussed in Davis's direct appeal follow:

> Shortly before 11:00 p.m. on May 19, 2014, a man called the Huntington County Sheriff's Department on its non-emergency line and reported that he had a warrant and "was strung out on meth and to come get him and take it all out of his house." (Tr. p. 99). In response to the call, the Sheriff's Department dispatched the Huntington Police Department to 533 East Franklin Street, Huntington, Indiana, upon verification that the occupant thereof, Davis, had an active warrant.
>
> * * * * *
>
> Fifteen minutes after the police had first knocked on the door, Davis came downstairs, along with Thomas Hale (Hale) and Amanda (Casto). The officers escorted him outside, placed him in handcuffs, and administered his *Miranda* warnings. Davis indicated that he and Hale had been manufacturing methamphetamine on the second floor of the house. Davis further stated that when they heard the officers knocking on the door, Hale began hiding the supplies. Thus, Davis offered to accompany the officers inside to show them where everything was. For safety reasons, the officers would not allow Davis back into the house, but upon questioning as to whether there was an active lab that could pose any danger to the officers, Davis assured them that everything was safe.
>
> As the officers climbed the staircase, they detected the "very distinct," "overwhelming chemical" odor associated with manufacturing methamphetamine. (Tr. pp. 247, 262). The odor was most potent in the upstairs bathroom, emanating from the toilet and the sink in particular. Once they confirmed that there

was nobody else in the house, the officers went back outside to retrieve their protective gear. After obtaining consent to search the home from the landlord, several officers trained in dismantling methamphetamine labs entered the house to process the scene.

No active methamphetamine lab was discovered, nor did the police officers recover any finished methamphetamine product. However, spread throughout nearly every room of the house, the officers found evidence of all of the ingredients and other equipment necessary to manufacture methamphetamine, including: numerous empty boxes and blister packs that had contained pseudoephedrine pills; empty boxes and the water bladders from cold compresses and the ammonium nitrate that had been extracted therefrom; lithium batteries and empty battery packages; salt; several bottles of drain cleaner (lye); Liquid Fire (sulfuric acid); three empty one-gallon containers of Coleman fuel (an organic solvent); coffee filters; plastic tubing; funnels; Ziploc bags; side cutters (for stripping the lithium out of the batteries); gas masks; and latex gloves. The search also revealed a plastic bag containing a liquid substance; a bottle that had been used as a "one-pot" (first stage of methamphetamine manufacturing); at least six bottles that had been used as hydrochloric gas (HCL) generators (second stage of methamphetamine manufacturing), one of which was located on the upstairs toilet lid; a cast iron skillet coated in white powder; a pill crusher; several loose syringes; and "partial directions on a couple steps of manufacturing methamphetamine." (Tr. pp. 206, 211). Testing on the liquid substance indicated the presence of methamphetamine, but the sample was too diluted to run a confirmatory test.

*Davis v. State*, No. 35A02-1411-CR-804, slip op. at 2-5 (Ind. Ct. App. June 2, 2015) ("Davis I").

[3]     The State charged Davis with dealing in methamphetamine within 1,000 feet of a youth program center as a class A felony. *Id.* at 5. In October 2014, the court held a jury trial. *Id.* During opening argument, Davis's trial counsel stated:

> And in the end, in the final analysis you will be asked to make a decision and the decision will be to convict or is there sufficient evidence to convict Ricci Davis of manufacturing methamphetamine or in the alternative, is there sufficient evidence to convict him of the possession of two (2) or more ingredients for methamphetamine and to convict him of permitting his house and we call that Maintaining a Common Nuisance, permitting his house to be used for the manufacture of methamphetamine.
>
> Ricci Davis isn't going to leave this trial without a conviction. That is clear. It's clear to me and it's clear to him. What we are going to ask you ladies and gentleman of the jury to determine what the conviction or convictions should actually be. And the Judge will guide you on that in final instructions.

Trial Transcript Volume II at 93.

[4]     During the State's evidence, Dathen Strine, a GIS / IT Technician for Huntington County, testified regarding the creation of maps and buffer zones and that on either side of a point of measurement would be a two and one-half foot margin of error for a total margin of error of five feet. He testified he created a map that measured the distance between Davis's residence and Trinity United Methodist Church. The court admitted the map as State's Exhibit 58, which indicates the distance as 970 feet. He stated that the distance could be as little as 965 feet and as great as 975 feet. He testified that he created

a map that measured the distance between Davis's residence and the Boys & Girls Club as 940 feet with a total margin of error of five feet. The court admitted the map as State's Exhibit 59.

[5] Outside the presence of the jury, the parties and the court discussed the admission of a disclaimer which states in part:

> By using this site, I agree that I understand and am bound by the following conditions.
>
> **General.** The information on this Web Site was prepared from a Geographic Information System established by Huntington County for their internal purposes only, and was not designed or intended for general use by members of the public. Huntington County, its employees, agents and personnel, makes no representation or warranty as to its accuracy, and in particular, its accuracy as to labeling, dimensions, contours, property boundaries, or placement or location of any map features thereon; nor to the accuracy of any other information contained thereon.
>
> **Disclaimer.** Huntington County Digital Data is the property of Huntington County, Indiana © **2000 Huntington County, IN**. All graphic data supplied by Huntington County has been derived from public records that are constantly undergoing change and is not warranted for content or accuracy. The county does not guarantee the positional or thematic accuracy of the data. . . . The data represents an actual reproduction of data contained in Huntington County's computer files. This data may be incomplete or inaccurate, and is subject to modifications and changes. . . .

Defendant's Exhibit A. The court sustained the prosecutor's objection to the disclaimer, stated that it would not allow the disclaimer into evidence, and

stated: "It is a disclaimer of liability and that's what it is. It's not a declaration as far as accuracy." Trial Transcript Volume III at 516.

[6] Davis's counsel tendered an instruction which stated that the jury could consider the included crimes of possession of chemical reagents or precursors with intent to manufacture controlled substances, possession of methamphetamine, or maintaining a common nuisance. The court refused to give the jury the instruction.

[7] During closing argument, Davis's counsel stated:

> [T]he elected prosecutor of Huntington County, ultimately gets to decide what charges are brought against the defendant . . . . And tin [sic] this case, ladies and gentlemen, boy did she reach for that brass ring. She went right for the A felony. She went right for the crime that has and is in the same category as aggravated rape and one spot less than murder. That's what she went for . . . which she's allowed to do. She has prosecutorial discretion. She can bring that charge if she wants but that means that she has to prove every element of that crime to you. It's not enough that she proves some other lesser crime. She has to prove that crime to you beyond a reasonable doubt. And I will submit to you, ladies and gentleman, that she has failed in that task.

Trial Transcript Volume IV at 587. Davis's counsel also stated:

> So then they move on to this thousand (1000) feet issue. I don't dispute that those buildings, by the way, are youth program centers. Those are good and (INAUDIBLE) programs that they have out there. They are a great thing for the community. They should be maintained. But what do we have as far as distances. Well, we know they didn't go out there and measure manually. It's what they used to do by the way. They used to go out with

one of those wheels that has the quickie things on it and every time you go a feet (sic), you get a foot. That is what they used to do. They don't do that anymore, apparently. They are content to have someone who sits downstairs in the same building to get on a computer and not type in addresses. He doesn't do that. He picks. He takes his mouse and clicks one spot and goes down. Then he clicks another spot and gets a distance. Now this has a margin of error. We know that. He testified that it is a five (5) foot margin of error. Of course, that is not verified. He stated they haven't verified that. It could be about anything. So we've got that margin of error. We've got the human margin of error. And then and this is the most important part, he has no idea how they get those . . . those distances. The head of the GIS website sat here and told you, "I don't know how they get those photos. I guess there is a plane or something and they must use a camera." That's how you are going to convict on an A felony? 'I guess there is a plan [sic] and there might be a camera?'

*Id.* at 597-598.

[8]     The jury found Davis guilty as charged. *Davis I*, slip op. at 5. After the jury was released, the court stated:

> This is just for part of the record. I would like the record to indicate that neither the State nor the defendant had requested a lesser included offense upon the Class B felony, Dealing in Methamphetamine. Had it been submitted the Court would have given to it . . . neither party requested it.

Trial Transcript Volume V at 625. The court sentenced him to fifty years in the Department of Correction. *Davis I*, slip op. at 5.

[9] On direct appeal, Davis argued that the trial court abused its discretion by failing to instruct the jury on lesser-included offenses of dealing in methamphetamine and excluding evidence regarding the accuracy of the State's measurement of distance between Davis's house and two youth program centers. *Id.* at 2. Davis also argued that his sentence was inappropriate in light of the nature of the offense and his character. *Id.* This Court affirmed. *Id.*

[10] On November 17, 2015, Davis filed a petition for post-conviction relief and on June 6, 2018, counsel amended the petition to include three claims: (1) that the subsection under which he had been convicted was unconstitutionally vague; (2) that appellate counsel had provided ineffective assistance by not raising a vagueness claim; and (3) that trial counsel provided ineffective assistance by not tendering jury instructions on manufacturing methamphetamine as a class B felony and the State's burden to prove less than 1,000 feet separated each youth program center from the exact center where methamphetamine had been made.

[11] On January 7, 2019, the court held an evidentiary hearing. Attorney Andrew Teel testified that he was Davis's trial counsel with Attorney Don Swanson as co-counsel. He indicated that the general trial strategy was to try to convince the jury "if they were going to enter [a] conviction to convict on . . . some 'D' Felonies would have been possession of precursors . . . that sort of thing . . . rather than going all way for the . . . 'A' Felony." Post-Conviction Transcript Volume II at 7. When asked if he ever thought about tendering a jury instruction on a lesser offense of manufacturing as a class B felony, he answered:

I don't, uh, I-I think that had we been able to get the evidence of the disclaimer in, I think the answer would have been yes, um, and obviously you're trying to do anything you can to avoid 'A' felony, um, but given the-the facts that were in-in evidence by the time it came around to-to Instruction time, I don't believe, you know, that it was, uh, an option, at least in my mind, any longer.

*Id.* at 9. He indicated it was fair to say that he did not think that an instruction on the class B felony was supported by the evidence. He indicated that the decision on the lesser included offense was probably Attorney Swanson's decision.

[12] Attorney Swanson testified that he represented Davis as lead counsel. When asked why he did not consider offering the jury an instruction on the lesser included offense of manufacturing as a class B felony,[1] he answered:

Because, uh, I feel that the Jury were – if you gave the Jury, uh, too much options you're creating excuses. Uh, I think that if, uh, if your [sic] delivering on a lesser included, it should be, a lesser included. Uh, Judge Heffelfinger appointed me in this case due to conflicts and the public defender appeal and, uh, I have about as much respect for him and he for me, uh, but, (laughing) that's, uh, he was- he was a very, uh, strict sentencing individual and if the Jury convicted of the 'B' Felony it would have been twenty (20) years, uh, no discussion.

---

[1] The Transcript states that Davis's post-conviction counsel asked Attorney Swanson, "given that – the thousand (1,000) foot element was an issue at trial, did you consider, uh, offering the Jury a lesser included on Manufacturing as a Class D felony?" Post-Conviction Transcript Volume II at 15. It appears that the reference to the class D felony is a scrivener's error or that Davis's post-conviction counsel intended to ask about an instruction on a class B felony.

*Id.* at 15-16. When asked if he felt that the class B instruction was not warranted by the evidence, he answered:

> Oh, no, clearly it would be, um, uh, warranted by the evidence.
> Uh, but I didn't think that that would be enough of a break, uh,
> you know, I thought it would be better strategically, uh, to go for
> the two (2) Class D Felony (SIC), uh, rather than the 'B'.

*Id.* at 16. When asked if this was a strategic decision on his part, he answered affirmatively. He indicated that he did not recall considering tendering an instruction to the jury that the 1,000 feet distance had to be between the youth program center and the exact location where the methamphetamine was made as opposed to the property line of where it was made. When asked on cross-examination whether he had a trial strategy in terms of trying to dispute the 1,000 foot enhancement, he answered:

> I believe that, uh, it was Andrew Teel that came up with this
> concept mid trial. Uh, he carefully evaluated their evidence and
> how they were doing measurements and there was a disclaimer,
> uh, which I was unaware of, which he discovered during the
> trial, uh, and the disclaimer should have come into evidence as
> far as I'm concerned, uh, but, I wasn't the Judge.

*Id.* at 17. He indicated he did not consider challenging whether the Boys & Girls Club was a youth program center. He testified that he considered challenging the preschool at a church as a youth program center but did not "feel as though it was going to go anywhere." *Id.* at 18. He indicated that he did not think about submitting any other instructions on lesser included offenses besides the two that he did.

On redirect examination, the following exchange occurred:

> Q  Um, I – I took your testimony to mean, when I was
> questioning you, that you did think of other lesser includeds
> (SIC).  You just decided not to tender them as a matter of
> strategy, is that correct?
>
> A  Uh, to clarify, I thi- I understood her question to be other than
> the lesser included 'B' and the two (2) 'Ds'.  I took it that way.  If
> she's asking me, um, did I consider the 'B', I did, and didn't do
> it.

*Id.* at 19.

After Davis's post-conviction counsel rested, the State presented the testimony of Strine, the GIS Coordinator for Huntington County, who stated that he testified at Davis's trial regarding two maps he created.  The court admitted a map that had been admitted at trial, and Strine testified that the entire property at 533 East Franklin Street was "incased in that thousand (1,000) foot 'buffer'" and that the entire house would be within 1,000 feet of part of the property of the Trinity Church.  *Id.* at 24.  When showed another map he created for Davis's trial, he indicated that the entire structure of the house was inside the green buffer zone.

On cross-examination, he testified that producing maps was not a normal feature that he did on a regular basis.  He also testified that the measurements had a margin of error of "two and a half (2 1/2 ) feet, so a grand total, from point to point, of five (5) foot . . . margin of error, and that's based off of the

company that supplied the aerial photography for us." *Id.* at 30. On redirect examination, he indicated that the margin of error was not on the "buffer zone" itself and the two and one-half feet did not have anything to do with the buffer zone but "just the red line" on the map. *Id.* at 31.

[16] Linda Grossman, the Director at Trinity pre-school, stated that she testified at Davis's trial, that the building or property for the preschool had two signs, one which read "Pre-School Trinity United Methodist Church" and another which read "Trinity Methodist Pre-school." *Id.* at 35. Mandy Reber, the Executive Director for the Boys & Girls Club in Huntington, stated that she testified at Davis's trial and that the Boys & Girls Club had a sign on the property in early 2014 which read "Boys and Girls Club of Huntington County." *Id.* at 40.

[17] Davis's post-conviction counsel stated that his argument was not that the statute was vague as applied to the facts of the case but that it was vague in its entirety and was "unconstitutionally vague as a whole." *Id.* at 45. He stated: "And I just want to make clear to the Court that we're not arguing that it's vague as applied to the facts of this case, I mean it's probably not vague as applied to the facts of this but, the *Johnson* case from the U.S. Supreme Court says it can still be vague overall, even if it's not vague in this case." *Id.* at 46. On April 4, 2019, the court denied Davis's petition.

## *Discussion*

[18] Before discussing Davis's allegations of error, we note the general standard under which we review a post-conviction court's denial of a petition for post-

conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

A. *Vagueness*

[19] We first address whether the statutes governing Davis's offense are unconstitutionally vague as applied to him. On appeal, Davis concedes that the relevant statutes are not vague as applied to him and that the statutes are not void under a traditional vagueness analysis. However, Davis appears to argue that the vagueness doctrine has been transformed and that, under the new analysis, "the YPC statute can be – and, in fact, is – void, even though it was not vague in all its applications and even though it reached no constitutionally protected conduct," and cites *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2019). Appellant's Brief at 21. He also

cites *Whatley v. Zatecky*, 833 F.3d 762 (7th Cir. 2016), and contends that case applied the new vagueness analysis to the statutes under which he was convicted.

[20] The amended charging information cited Ind. Code § 35-48-4-1.1(b)(3)(B)(iv) and alleged that, "[s]ometime during the time period of January 1, 2014 through May 20, 2014, . . . [Davis] knowingly manufactured methamphetamine, pure or adulterated, . . . within one thousand (1,000) feet of a youth program center." Appellant's Direct Appeal Appendix Volume I at 12.

[21] At the time of the alleged offense, Ind. Code § 35-48-4-1.1 provided that a person who "knowingly or intentionally . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony," and "[t]he offense is a Class A felony if . . . the person manufactured . . . the drug . . . in, on, or within one thousand (1,000) feet of . . . a youth program center."[2] Ind. Code § 35-31.5-2-357 provides:

> (a) "Youth program center" means the following:
>
>> (1) A building or structure that on a regular basis provides recreational, vocational, academic, social, or other

[2] (Subsequently amended by Pub. L. No. 158-2013, § 623 (eff. July 1, 2014); Pub. L. No. 168-2014, § 92 (eff. July 1, 2014); Pub. L. No. 226-2014(ts), § 7 (eff. July 1, 2014); Pub. L. No. 44-2016, § 3 (eff. July 1, 2016); Pub. L. No. 252-2017, § 22 (eff. July 1, 2017)). "In 2014, as part of Indiana's comprehensive criminal code reform, the legislature made three changes. It deleted the youth program center and family housing complex zones, tightened the proximity element to 500 feet, and . . . added the element that a minor's presence be 'reasonably expected.'" *McAlpin v. State*, 80 N.E.3d 157, 162 (Ind. 2017).

programs or services for persons less than eighteen (18) years of age.

(2) The real property on which a building or structure described in subdivision (1) is located.

(b) The term does not include school property (as defined in section 285 of this chapter).

In *Johnson v. United States*, the United States Supreme Court discussed the Armed Career Criminal Act of 1984, which provided that a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a "violent felony." 135 S. Ct. 2551, 2555 (2015) (quoting 18 U.S.C. § 924(e)(2)(B)). The Act defined "violent felony" as follows:

any crime punishable by imprisonment for a term exceeding one year . . . that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*

*Id.* at 2555-2556 (quoting § 924(e)(2)(B)) (emphasis added in opinion). The Court indicated that the italicized words had come to be known as the Act's residual clause and addressed whether it survived the Constitution's prohibition of vague criminal laws. *Id.* at 2556. The Court granted *certiorari* to decide

whether Minnesota's offense of unlawful possession of a short-barreled shotgun

ranked as a violent felony under the residual clause. *Id.*

[23] The Court held:

> The Fifth Amendment provides that "[n]o person shall . . . be
> deprived of life, liberty, or property, without due process of law."
> Our cases establish that the Government violates this guarantee
> by taking away someone's life, liberty, or property under a
> criminal law so vague that it fails to give ordinary people fair
> notice of the conduct it punishes, or so standardless that it invites
> arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357-
> 358, 103 S. Ct. 1855, 75 L.Ed.2d 903 (1983). The prohibition of
> vagueness in criminal statutes "is a well-recognized requirement,
> consonant alike with ordinary notions of fair play and the settled
> rules of law," and a statute that flouts it "violates the first
> essential of due process." *Connally v. General Constr. Co.*, 269 U.S.
> 385, 391, 46 S. Ct. 126, 70 L.Ed. 322 (1926). These principles
> apply not only to statutes defining elements of crimes, but also to
> statutes fixing sentences. *United States v. Batchelder*, 442 U.S. 114,
> 123, 99 S. Ct. 2198, 60 L.Ed.2d 755 (1979).
>
> In *Taylor v. United States*, 495 U.S. 575, 600, 110 S. Ct. 2143, 109
> L.Ed.2d 607 (1990), this Court held that the Armed Career
> Criminal Act requires courts to use a framework known as the
> categorical approach when deciding whether an offense "is
> burglary, arson, or extortion, involves use of explosives, or
> otherwise involves conduct that presents a serious potential risk
> of physical injury to another." Under the categorical approach, a
> court assesses whether a crime qualifies as a violent felony "in
> terms of how the law defines the offense and not in terms of how
> an individual offender might have committed it on a particular
> occasion." *Begay*, *supra*, at 141, 128 S. Ct. 1581.
>
> Deciding whether the residual clause covers a crime thus requires
> a court to picture the kind of conduct that the crime involves in

"the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James*, *supra*, at 208, 127 S. Ct. 1586. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has *as an element* the use . . . of physical force," the residual clause asks whether the crime "*involves conduct*" that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence *after* making his demand or because the burglar might confront a resident in the home *after* breaking and entering.

We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law.

*Id.* at 2556-2557. The Court further held that "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime," "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements," and "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2557-2558.

[24] In *Sessions v. Dimaya*, the Court addressed whether a similarly-worded clause in a statute's definition of "crime of violence" suffers from the same constitutional

defect. 138 S. Ct. 1204, 1210 (2019). The Immigration and Nationality Act ("INA") renders deportable any alien convicted of an "aggravated felony" after entering the United States. *Id.* (quoting 8 U.S.C. § 1227(a)(2)(A)(iii)). The INA defines "aggravating felony" by listing numerous offenses and types of offenses, often with cross-references to federal criminal statutes. *Id.* According to one item on that list, an aggravated felony includes "a crime of violence (as defined in section 16 of title 18 . . .) for which the term of imprisonment [is] at least one year." *Id.* at 1211 (quoting § 1101(a)(43)(F)). The specified statute, 18 U.S.C. § 16, provides the federal criminal code's definition of "crime of violence." The statute's two parts, "often known as the elements clause and the residual clause," cover:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* Section 16(b), the residual clause, was the part of the statute at issue in the case. *Id.*

Justice Kagan announced the judgment of the Court and delivered the opinion with respect to Parts I, III, IV-B, and V, in which Justices Ginsburg, Breyer,

and Sotomayor joined.[3]  Writing for the plurality, she wrote that to decide whether a person's conviction falls within the ambit of the residual clause, courts use a distinctive form of what they have called the categorical approach. *Id.* at 1211.  She stated:

> The question, we have explained, is not whether "the particular facts" underlying a conviction posed the substantial risk that § 16(b) demands.  [*Leocal v. Ashcroft*, 543 U.S. 1, 7, 125 S. Ct. 377 (2004)].  Neither is the question whether the statutory elements of a crime require (or entail) the creation of such a risk in each case that the crime covers.  The § 16(b) inquiry instead turns on the "nature of the offense" generally speaking.  *Ibid.* (referring to § 16(b)'s "by its nature" language).  More precisely, § 16(b) requires a court to ask whether "the ordinary case" of an offense poses the requisite risk.  *James v. United States*, 550 U.S. 192, 208, 127 S. Ct. 1586, 167 L.Ed.2d 532 (2007); *see infra*, at 1213-1214.

*Id.* at 1211.  She summarized:

> In sum, § 16(b) has the same "[t]wo features" that "conspire[d] to make [the residual clause of the Armed Career Criminal Act ('ACCA')] unconstitutionally vague."  [*Johnson*, 135 S. Ct. at 2557].  It too "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents" some not-well-specified-yet-sufficiently-large degree of risk.  *Id.*, at ——, 135 S. Ct., at 2556-2557.  The result is that § 16(b) produces, just as ACCA's residual clause

---

[3] Justice Gorsuch authored a separate opinion concurring in part and concurring in the judgment and stated that he joined Parts I, III, IV-B, and V of the Court's opinion. *See Dimaya*, 138 S. Ct. at 1224-1234.  Chief Justice Roberts, Justice Kennedy, Justice Thomas, and Justice Alito dissented. *See id.* at 1234-1259.

did, "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.*, at ——, 135 S. Ct., at 2558.

*Id.* at 1216. She concluded:

> *Johnson* tells us how to resolve this case. That decision held that "[t]wo features of [ACCA's] residual clause conspire[d] to make it unconstitutionally vague." 576 U.S., at ——, 135 S. Ct., at 2557. Because the clause had both an ordinary-case requirement and an ill-defined risk threshold, it necessarily "devolv[ed] into guesswork and intuition," invited arbitrary enforcement, and failed to provide fair notice. *Id.*, at ——, 135 S. Ct., at 2559. Section 16(b) possesses the exact same two features. And none of the minor linguistic disparities in the statutes makes any real difference. So just like ACCA's residual clause, § 16(b) "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.*, at ——, 135 S. Ct., at 2558.

*Id.* at 1223.

[26] In *United States v. Davis*, the Supreme Court addressed 18 U.S.C. § 924(c), which authorizes heightened criminal penalties for using or carrying a firearm "during and in relation to," or possessing a firearm "in furtherance of," any federal "crime of violence or drug trafficking crime." 139 S. Ct. 2319, 2324 (2019) (quoting § 924(c)(1)(A)). The statute defines "crime of violence" in two subparts—the first known as the elements clause, and the second the residual clause. *Id.* According to § 924(c)(3), a crime of violence is "an offense that is a felony" and

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.*

The Court held:

What do *Johnson* and *Dimaya* have to say about the statute before us? Those decisions teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." But does § 924(c)(3)(B) require that sort of inquiry? The government and lower courts have long thought so. For years, almost everyone understood § 924(c)(3)(B) to require exactly the same categorical approach that this Court found problematic in the residual clauses of the ACCA and § 16. Today, the government acknowledges that, if this understanding is correct, then § 924(c)(3)(B) must be held unconstitutional too.

But the government thinks it has now found a way around the problem. In the aftermath of our decisions holding the residual clauses of the ACCA and § 16(b) unconstitutionally vague, the government "abandon[ed] its longstanding position" that § 924(c)(3)(B) requires a categorical analysis and began urging lower courts to "adopt a new 'case specific' method" that would look to "the 'defendant's actual conduct' in the predicate offense." [*United States v. Davis*, 903 F.3d 483, 485 (5th Cir. 2018)]. Now, the government tries the same strategy in this Court, asking us to abandon the traditional categorical approach and hold that the statute actually commands the government's new case-specific approach. So, while the consequences in this case may be of constitutional dimension, the real question before us turns out to be one of pure statutory interpretation.

*Id.* at 2326-2327 (footnote omitted).

[28]     The Court held that § 924(c)(3)(B) was unconstitutionally vague and stated:

> The language of the residual clause itself reinforces the
> conclusion that the term "offense" carries the same "generic"
> meaning throughout the statute.  Section 924(c)(3)(B), just like §
> 16(b), speaks of an offense that, "by its nature," involves a certain
> type of risk.  And that would be an exceedingly strange way of
> referring to the circumstances of a specific offender's conduct.
> As both sides agree, the "nature" of a thing typically denotes its
> "'normal and characteristic quality,'" *Dimaya*, 584 U.S., at ——,
> 138 S. Ct., at 1217 (quoting Webster's Third New International
> Dictionary 1507 (2002)), or its "'basic or inherent features,'"
> *United States v. Barrett*, 903 F.3d 166, 182 (CA2 2018) (quoting
> Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed.
> 2010)).  So in plain English, when we speak of the nature of an
> offense, we're talking about "what an offense normally—or, as
> we have repeatedly said, 'ordinarily'—entails, not what
> happened to occur on one occasion."  *Dimaya*, 584 U.S., at ——,
> 138 S. Ct., at 1217; *see Leocal*, 543 U.S. at 7, 125 S. Ct. 377
> (contrasting the "nature of the offense" with "the particular facts
> [of] petitioner's crime").

*Id.* at 2329.  The Court observed:

> Congress always remains free to adopt a case-specific approach
> to defining crimes of violence for purposes of § 924(c)(3)(B) going
> forward.  As Mr. Davis and Mr. Glover point out, one easy way
> of achieving that goal would be to amend the statute so it covers
> any felony that, "based on the facts underlying the offense,
> involved a substantial risk" that physical force against the person
> or property of another would be used in the course of committing
> the offense.  Brief for Respondents 46 (quoting H. R. 7113, 115th
> Cong., 2d Sess. (2018); emphasis deleted); *see also* Tr. of Oral

Arg. 19 (government's counsel agreeing that this language would offer "clearer" support for the case-specific approach than the current version of the statute does). The dissent's catalog of case-specific, risk-based criminal statutes supplies plenty of other models Congress could follow. Alternatively still, Congress might choose to retain the categorical approach but avoid vagueness in other ways, such as by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive.

*Id.* at 2336.[4]

[29] With that background in mind, we turn to *Whatley v. Zatecky*, 833 F.3d 762 (7th Cir. 2016), which was issued after *Johnson* but prior to *Dimaya* and *Davis*. In that case, the Seventh Circuit addressed a conviction for possession of cocaine within 1,000 feet of a youth program center. The Court held:

> Whatley contends that the statute is impermissibly vague because it defines "youth program center" as a facility with "regular" youth programs, and "regular" is a word with multiple, inconsistent constructions. According to Whatley, no reasonable person could have known which facilities the state would deem "youth program centers," or that the state would consider the Robinson Community Church to meet the definition. The church, he notes, hosted children's events for a few hours at a time, a few days each week. In contrast, facilities such as

---

[4] Justices Kavanaugh, Thomas, Alito, and Chief Justice Roberts dissented. *See Davis*, 139 S. Ct. at 2336-2355.

YMCAs or Boys and Girls Clubs provide youth events constantly, or at least as a normal part of their programming. These types of facilities lie at the core of the "school-zone" statute, according to Whatley, and the statute's use of the word "regular" provided no discernable standard for defendants, prosecutors, judges or juries to apply to facilities outside that core.

833 F.3d at 776.

[30] The Court held that "[i]t is the particular language of the Indiana statute that is at issue here, and more importantly the unique circumstances of its application to Whatley." *Id.* at 782. The Court stated:

> [T]he State argues that a person of ordinary intelligence would understand that the number of youth programs held at the Robinson Community Church were sufficient to render it a youth program center. This is essentially an argument that the church held so many programs that it would meet any definition of "regular," and that Whatley's case is in the core of the conduct prohibited by the statute. But four or six activities a week at a facility that is not otherwise identifiable as a youth program center is nowhere near the core of the statute. Had Whatley possessed drugs within 1000 feet of a YMCA or a Boys and Girls Club, there would be no doubt that his conduct was within the core of the law. The State conceded in its argument to the Indiana Supreme Court that churches are not inherently places where children gather, and a handful of weekly events does nothing to provide fair notice or to discourage arbitrary enforcement of the statute.

*Id.* at 783 (footnote omitted). The Court noted:

In *Johnson*, the Supreme Court remarked that "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 135 S. Ct. at 2561. In analyzing the vagueness of a federal sentencing statute, the Court also noted that "If we hold a statute to be vague, it is vague in all its applications[.]" *Id.* Whatley argued to the state courts that the law was vague "as applied" to him and so we will nevertheless consider the State's argument that Whatley's conduct fell within some constitutional core of the statute.

*Id.* at 783 n.15. The Court concluded:

In sum, a triad of factors convince us that the state courts were not simply wrong but unreasonable in applying federal law on vagueness in Whatley's case: (1) the use of the word "regular" in the definition of "youth program center" provides no objective standard, and thereby fails to place persons of ordinary intelligence on notice of the conduct proscribed and allows for arbitrary enforcement; (2) defendants are strictly liable for violating the terms of this nebulous sentencing enhancement, exacerbating the effect of the subjectivity; and (3) the consequences of violating this indeterminate strict liability provision are extreme: an increase in the sentencing range from 2-to-8 years to 20-to-50 years' imprisonment. The Indiana courts failed to narrow the statute by adding an intent element, by limiting application to the core cases of facilities such as YMCAs or Boys and Girls Clubs, or by providing any objective standard to the meaning of "regular." There was no "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98, 131 S. Ct. 770. As applied to Whatley, the statute delegated to the police, the prosecutor and the jury the task of determining what conduct was proscribed. No one in Whatley's position could have known that the Robinson Community Church would fall within the definition simply because it hosted a handful of children's events each week and otherwise bore no indicia of the children's

activities within. We therefore reverse and remand the judgment, with instructions to grant the writ of habeas corpus ordering that, within sixty days, Whatley either be released or that he be re-sentenced under the Class C felony statute.

*Id.* at 784.

[31] We cannot say that the Seventh Circuit applied the categorical approach mentioned in *Johnson*, *Dimaya*, and *Davis*. Rather, it held that "[i]t is the particular language of the Indiana statute that is at issue here, and more importantly the unique circumstances of *its application to* Whatley," and concluded that "[a]s *applied to* Whatley, the statute delegated to the police, the prosecutor and the jury the task of determining what conduct was proscribed." *Id.* at 782, 784 (emphases added). Unlike the statutes discussed in *Johnson*, *Dimaya*, and *Davis*, we cannot say that Ind. Code § 35-48-4-1.1, which governs dealing in methamphetamine, or Ind. Code § 35-31.5-2-357, which defines a youth program center, suffers from the same qualities as those statutes warranting a categorical approach. Rather, we note that the Court in *Davis* observed that a way of adopting a case-specific approach is to create a statute that covers any felony that, based on the facts underlying the offense, involved a substantial risk that physical force against the person or property of another would be used in the course of committing the offense. *Davis*, 139 S. Ct. at 2336. Ind. Code §§ 35-48-4-1.1 and 35-31.5-2-357 adopt a case-specific approach by focusing on the facts underlying the offense. We conclude that reversal is not warranted on this basis.

B. *Effective Assistance of Counsel*

[32] The next issue is whether Davis was denied the effective assistance of trial counsel and appellate counsel. Generally, to prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[33] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will

not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

[34] We apply the same standard of review to claims of ineffective assistance of appellate counsel as we apply to claims of ineffective assistance of trial counsel. *Williams v. State*, 724 N.E.2d 1070, 1078 (Ind. 2000), *reh'g denied*, *cert. denied*, 531 U.S. 1128, 121 S. Ct. 886 (2001). Ineffective assistance of appellate counsel claims fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013). To show that counsel was ineffective for failing to raise an issue on appeal thus resulting in waiver for collateral review, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Id.* To evaluate the performance prong when counsel waived issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are clearly stronger than the raised issues. *Id.* If the analysis under this test demonstrates deficient performance, then we evaluate the prejudice prong which requires an examination of whether the issues which

appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id.*

### 1. *Appellate Counsel*

Davis argues that "a vagueness claim based on *Johnson* was unavailable at the time of Davis's direct appeal, which means that appellate counsel cannot be faulted for not having raised it." Appellant's Brief at 40. He also asserts that, "[i]f this Court finds that the claim was available, however, then appellate counsel provided ineffective assistance by not raising it." *Id.* In light of our earlier discussion, we cannot say that Davis's appellate counsel was ineffective for failing to raise a vagueness claim under *Johnson*.

### 2. *Trial Counsel*

Davis argues that his trial counsel were ineffective for failing to tender a lesser included instruction on dealing in methamphetamine as a class B felony. He asserts that he was prejudiced because both youth program centers were over 900 feet from his residence and the State made no effort to measure to the upstairs bedroom. **(Br. 44)** He also asserts that "though [his] house was within the green shaded areas on Exhibits 58 and 59, those areas, like the red lines, presumably included a margin of error." Appellant's Brief at 44.

To prevail on this claim, Davis has the burden to show that counsel unreasonably failed to request a proper instruction and that he was prejudiced by the failure. *See Potter v. State*, 684 N.E.2d 1127, 1134 (Ind. 1997). The

Indiana Supreme Court has held that "a tactical decision not to tender a lesser included offense does not constitute ineffective assistance of counsel, even where the lesser included offense is inherently included in the greater offense." *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind. 1998). In *Autrey*, the Court held that trial counsel was not ineffective for failing to request lesser-included offense instructions on a charge of murder because it represented a reasonable "all or nothing" tactical choice by defense counsel to obtain a full acquittal for the defendant by placing the blame for the victim's death on another person and highlighting the "discordant" testimony of the witnesses. *Id.* at 1141-1142. *See also Sarwacinski v. State*, 564 N.E.2d 950, 951 (Ind. Ct. App. 1991) (holding that it was not ineffective assistance not to request voluntary manslaughter instruction on a murder charge because it might have undermined defense of self-defense and/or lessened chance of the defendant's acquittal).

[38]    In deciding whether counsel was ineffective for failure to tender an instruction on dealing in methamphetamine as a class B felony, we must determine whether Davis could have been convicted of it as a lesser offense. *See Sanchez v. State*, 675 N.E.2d 306, 311 (Ind. 1996). We look first to whether the offense of dealing in methamphetamine as a class B felony is included within the charged crime of dealing in methamphetamine as a class A felony, and second to whether an instruction on dealing in methamphetamine as a class B felony would have conformed to the evidence presented at trial. *See id.* To justify a lesser included instruction, "there must exist 'evidence before the jury such that it could conclude the lesser included offense was committed while the greater

one was not.'" *Id.* (quoting *Pedrick v. State*, 593 N.E.2d 1213, 1216 (Ind. Ct. App. 1992), *reh'g denied*).

[39] During closing argument, Davis's trial counsel argued for an all-or-nothing approach and asserted that the prosecutor reached for "that brass ring," "went right for the A felony," and "[h]er reach has exceeded her grasp." Trial Transcript Volume IV at 587, 599. At the post-conviction hearing, Attorney Teel testified that given the evidence he did not believe a class B felony was an option when the instructions were being discussed. Attorney Swanson stated that a class B felony instruction was warranted by the evidence but later testified that the disclaimer should have been admitted into evidence. He also stated that he considered offering an instruction on the class B felony and decided against it as a matter of strategy.

[40] To the extent Davis points to the trial exhibits, State's Exhibit 58 states that the distance from the Trinity UMC Structure to Davis's residence was 970 feet, and State's Exhibit 59 states that the distance between the Boys & Girls Club and his residence was 940 feet. At the post-conviction hearing, Strine, the GIS Coordinator for Huntington County, testified that the entire property at 533 East Franklin Street was "incased in that thousand (1,000) foot 'buffer'" and that the entire house would be within 1,000 feet of part of the property of the Trinity Church. Post-Conviction Transcript Volume II at 24. When presented with another map he created for Davis's trial, he indicated that the entire structure of the house was inside the green buffer zone. He also testified that the margin of error was not on the buffer zone itself and the two and one-half

feet did not have anything to do with the buffer zone but just the red line on the map. We cannot say that the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

[41] For the foregoing reasons, we affirm the denial of Davis's petition for post-conviction relief.

[42] Affirmed.

Baker, J., concurs.

Riley, J., concurs in result without opinion.